Larry A. **WHITMAN**, Plaintiff,

v.

**CSX TRANSPORTATION, INC.**, Defendant.

Robert K. **HOBSON**, Plaintiff,

v.

**CSX TRANSPORTATION, INC.**, Defendant.

No. 94–CV–10152–BC.

United States District Court,
E.D. Michigan,
Northern Division.

June 2, 1995.

Daniel T. Sawers, Buffalo, NY, Randall S. Winston, Waterford, MI, for plaintiffs.

A.T. Lippert, Saginaw, MI, for defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CLELAND, District Judge.

#### I. Introduction

Plaintiffs have brought actions under the Federal Employers' Liability Act ("FELA"), alleging that they suffered hearing loss as a result of the defendant's negligence in failing to provide them with a safe place to work. Defendant's motion for summary judgment (D. 9) argues that the plaintiffs' claims are barred by the applicable statute of limitations.

After reviewing the motion and the plaintiffs' response thereto, the court determines that the matter can be determined without a hearing. The motion will be granted.

#### II. Background

Plaintiffs are long-term employees of the defendant railroad; both commenced their employment with the defendant in 1969, and both claim hearing loss as a result of the defendant's negligence. They filed separate complaints on May 24, 1994, and the cases were consolidated by order of this court on August 24, 1994.

#### Whitman

Plaintiff Whitman completed a hearing loss questionnaire supplied by the defendant on May 24, 1990, exactly four years before filing this suit. (See Exhibits A and B to Defendant's Brief). The following are some of the questions on the form and the answers Whitman supplied:

Do you have any difficulty in hearing? *Yes.*

When did you first notice this difficulty? *about 1986.*

How do you feel your hearing is at the present time? *Poor.*

Do you have any idea what may have caused any hearing difficulty which you have? If yes, explain what you believe and why. *Yes. Constant humming noise, air blowing, horn and bell sounding in ears when on engs [sic], wheels squealing on box cars when working on ground.*

Have you ever worked in any non-railroad job which was noisy? *No.*

Do you believe that your difficulty in hearing has any connection with your employment by a railroad. If so, why do you think that? *Yes. Constant humming noise from eng [sic] horn and bell sounding in ears, the squeal of box cars wheels on rail.*

Has any physician or medical care provider ever told you that you had hearing loss? *No.*

Has any physician or medical care provider ever suggested that you have hearing loss which is connected with your employment? *No.*

Whitman circled the word "yes" and placed an X next to the word "currently" to indicate that he had the following conditions: "difficulty in understanding spoken words in a noisy environment," "feeling that familiar sounds are muffled," and "need to be near or look at a person speaking to help understand the words."

In response to Defendant's Request for Admission in connection with this litigation, signed by Whitman's counsel on November 29, 1994, Whitman admitted that he answered and signed the hearing loss questionnaire and that the copy submitted by the defendant is a genuine and authentic copy of the original questionnaire. (Exhibit B to Defendant's Brief). However, he denied all of the following:

that he "truthfully and accurately answered the questions in the railroad hearing loss questionnaire to the best of his knowledge and belief";

that he first noticed difficulty in hearing in 1986;

that in 1986, he noticed that he was having a difficult time understanding conversations over the telephone;

that, as of May 24, 1990, he had difficulty in understanding spoken words in a noisy environment;

that, as of May 24, 1990, he had a feeling that familiar sounds were muffled;

that, as of May 24, 1990, he needed to be near or look at a person speaking to help understand the words;

that, as of May 24, 1990, he had a difficult time understanding people talking and understanding radio conversations on railroad locomotives; and

that, as of May 24, 1990, he suspected that his difficulty in hearing was connected with his employment with the railroad.

Plaintiff Whitman did not respond to the defendant's request to admit, "As of May 24, 1990, Larry A. Whitman had diffiuclty [sic] understanding people when they were speaking in a low tone." Accordingly, that statement is deemed admitted by Plaintiff Whitman under Fed.R.Civ.P. 36.

On May 17, 1991, Whitman's hearing was tested by a consultant hired by the defendant. The report of this test, dated August 7, 1991, states, "Your hearing in both ears is satisfactory for hearing and understanding conversation." The report also contains small graphs of readings from the right and left ear, though the numbers are not explained.

In his affidavit, Whitman attests that he "relied upon the representation made by the aforementioned notice that my hearing was 'satisfactory' and, therefore, I did not know or have any reason to know that I actually had a hearing loss which was related to my employment with the Defendant." (Whitman Affidavit, para. 6, Exhibit 2 to Plaintiffs' Brief). Whitman further attested, "That at no time did anyone from the Defendant, CSX TRANSPORTATION, INC., inform me or give me any information whatsoever that I was being exposed to noise at work that might cause a hearing loss." (*Id.*, para. 7).

On May 13, 1993, Plaintiff had an independent audiogram performed. At that time, he was informed that his hearing loss was due to noise exposure. (Whitman Affidavit, para. 8; Exhibit 2 to Plaintiffs' Brief).[1]

### Hobson

Plaintiff Hobson completed a hearing loss questionnaire on January 21, 1990, about four years and four months before filing this lawsuit. The following are some of the questions on the form and the answers he supplied.

Do you have any difficulty in hearing? *Yes.*

When did you first notice this difficulty? *1987.*

How do you feel your hearing is at the present time? *Fair*

Do you have any idea what may have caused any hearing difficulty which you have? *No.*

Do you believe that your difficulty in hearing has any connection with your employment by a railroad. If so, why do you think that? *Yes. Because I could hear normal conversation before I came to the railroad.*

Has any physician or medical care provider ever told you that you had hearing loss? *No.*

Has any physician or medical care provider ever suggested that you have hearing loss which is connected with your employment? *No.*

Hobson circled the word "yes" to indicate that he had the following conditions: pain in the ears, ringing in the ears, feeling pressure in the ears, difficulty in understanding spoken words in a noisy environment, feeling that familiar sounds are muffled, and "need to be near or look at a person speaking to help understand the words."

In response to Defendant's Request for Admission in connection with this litigation, signed by Hobson's counsel on November 29, 1994, Hobson admitted that he answered and signed the hearing loss questionnaire and

---

1. Plaintiffs' brief argues that on May 13, 1993, Whitman "was advised that he suffered from a noise-induced, work-related hearing loss." (Plaintiffs' Brief, p. 3). This statement is slightly misleading. Whitman's affidavit states that on May 13, 1993, he was "informed that [his] hearing loss was due to noise exposure." (Whitman Affidavit, para. 8; Exhibit 2 to Plaintiffs' Brief). Thus, Whitman did not attest that he first learned of his hearing loss in May 1993; rather his affidavit suggests that he knew he had hearing loss but learned for the first time on May 13, 1993 that his hearing loss was due to his employment with the railroad.

that the copy submitted by the defendant is a genuine and authentic copy of the original questionnaire. (Exhibit D to Defendant's Brief). He also admitted that in 1987, his wife told him that he had the volume on the television turned up all the time and that the volume was too loud. However, he denied all of the following:

> that he "truthfully and accurately answered the questions in the railroad hearing loss questionnaire to the best of his knowledge and belief";

> that he first noticed difficulty in hearing in 1987;

> that as of January 21, 1990, he could not hear normal conversations;

> that as of January 21, 1990, he suspected that his difficulty in hearing was connected with his employment with the railroad;

> that as of January 21, 1990, he suspected that his difficulty in hearing was connected with his employment with CSX Transportation, Inc.;

> that as of January 21, 1990, he had pain in his ears, ringing in the ears, and a feeling of pressure in his ears;

> that as of January 21, 1990, he had difficulty in understanding spoken words in a noisy environment;

> that, as of January 21, 1990, he had a feeling that familiar sounds were muffles [sic];

> that, as of January 21, 1990, he needed to be near or look at a person speaking to help understand the words.

The defendant tested Hobson's hearing on June 14, 1991. Plaintiff Hobson received notice, dated July 2, 1991, indicating,

> Your hearing in both ears is satisfactory for hearing and understanding conversation. There is however, some hearing loss for the high-pitched tones for which you were tested. You have had a change in hearing in both ears at some tones according to regulations.... Because of the hearing loss reported above, you should be further evaluated by a hearing specialist for what does appear to be a medical/audi-ological condition. This would be at your own expense.

(Exhibit 3 to Plaintiffs' Brief).

Hobson indicated in his affidavit that at about the same time as he filled out the questionnaire, he met with a claim agent for the defendant and that the claim agent told him "that [he] did not have a claim for the hearing loss [he] noted on the questionnaire, due to the fact that any loss [he] had suffered was caused by aging and not due to any noise exposure on the railroad." (Hobson Affidavit, para. 6, Exhibit 4 to Plaintiffs' Brief). Hobson further attested that he relied on the claim agent's representation that his hearing loss was not noise related "and, therefore, [he] did not know or have any reason to know that the actual cause of [his] hearing loss was related to [his] employment with the Defendant." (Id., para. 7). Hobson attests, "That at no time did anyone from the Defendant, CSX TRANSPORTATION, INC., inform me or give me any information whatsoever that I was being exposed to noise at work that might cause a hearing loss." (Id., para. 9).

Hobson had an independent audiogram performed on May 13, 1993. He attested that at that time he "was informed that [his] hearing loss was due to noise exposure." (Id., para. 10).

### III. Standard

■ Under Fed.R.Civ.P. 56, summary judgment should be entered only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Furthermore, summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91

L.Ed.2d 202 (1986). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; it is required that there be no genuine issue of *material* fact. The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552. The non-moving party must show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989). The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor. *Id.* at 1476. The non-moving party must also present affirmative evidence on critical issues. *Id.* at 1477. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Thus, it is this Court's role to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Id.* at 587, 106 S.Ct. at 1356.

## IV.  Discussion

This case requires the court to interpret the statute of limitations in suits brought under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 56. The statute provides, "No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued."

■ The plaintiff bears the burden of proving that his cause of action was commenced within the three-year period. *Emmons v. Southern Pac. Transp. Co.*, 701 F.2d 1112, 1118 (5th Cir.1983). "Compliance with 45 U.S.C. § 56 is a condition precedent to an injured employee's recovery in a FELA action." *Id.* at 1117 (citing *Gulf, Colorado & Santa Fe R.R. Co. v. McClelland*, 355 F.2d 196, 197 (5th Cir.1966)). "Failure to timely bring suit not only bars the claimant's remedy, but it also destroys the employer's liability." *Emmons*, 701 F.2d at 1117 (citing *Dixon v. Martin*, 260 F.2d 809, 811 (5th Cir. 1958)).

### A.  Applicable Rule

■ Cases brought under FELA can be grouped into four categories for the purpose of analyzing when the statute of limitations accrues: In the first category are suits involving a traumatic event and contemporaneous manifestation of injury. These cases fall squarely within the general rule that a tort cause of action accrues when there has been a violation of legally protected interests, and this violation usually occurs when the tortious event is committed. *Hicks v. Hines, Inc.*, 826 F.2d 1543, 1544 (6th Cir.1987). Thus, the cause of action accrues on the day that the traumatic event, with its accompanying manifestation of injury, occurs.

The second category of cases consists of a traumatic and clearly damaging event, followed by latent injury. "The traumatic event/latent manifestation case occurs when a noticeable, traumatic occurrence causes both obvious and latent injuries. Although the ultimate gravity of the harm may not be manifest, the plaintiff recognizes both the injury and its cause." *Id.* at 1544–45. The standard in such cases is the same as in the traumatic event/contemporaneous manifestation cases. "If greater than *de minimis* harm is discernable at the time of the tortious event, then the 'time of the event' rule applies, plaintiff's cause of action accrues, and the statute of limitations begins to run." *Id.* at 1544.

The third type of case, as described by the Sixth Circuit, is a "latent injury case," which "occurs when the plaintiff is either unaware of the injury or unaware of its cause until a significant period of time has elapsed following the tortious act." *Id.* at 1545. With respect to this type of case, the Sixth Circuit noted,

[I]f the injured person sustains an injury which cannot itself reasonably be discovered, or the cause of which cannot reasonably be discovered, until some time following the tortious event and the running of

the statute of limitations, courts often apply the 'discovery' rule, tolling the running of the statute of limitations to the date by which the plaintiff reasonably should have discovered both cause and injury.

*Id.*[2] This rule is known as the discovery rule. It was enunciated by the United States Supreme Court in *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). *Urie* held that the statute of limitations in cases of latent injuries does not commence to run until the plaintiff discovers or reasonably should have discovered his injury and its likely cause, even though it might later be proved that the injury occurred earlier. In the course of rejecting the idea that the action accrues when the injury occurs, even if the plaintiff is then unaware of it, the Court also rejected the theory that a new cause of action arises each day the plaintiff is exposed to the alleged hazard. The Court explained:

> Respondent contends that Urie, having been exposed to silica dust since approximately 1910, must unwittingly have contracted silicosis long before 1938, and hence that his 'cause of action' must be deemed to have 'accrued' longer than three years before the institution of this action. Alternatively it may be argued that each inhalation of silica dust was a separate tort giving rise to a fresh 'cause of action,' and that Urie is therefore limited to a claim for inhalations between November 25, 1938 [three years prior to the date on which the plaintiff filed suit], and the spring day in 1940 when he became incapacitated.
>
> In our view, however, neither of the outlined constructions of the statute of limitations can be sustained.

*Id.* at 169, 69 S.Ct. at 1024. In *Urie,* as in *Hicks,* the plaintiff stopped working for the defendant at about the same time as he discovered his illness.

The fourth type of case is exemplified by the case at bar, which could be called a "continuing conduct, previously latent, manifest injury case." This case is similar to a "latent injury case" in that the plaintiffs did not discover that the alleged injurious effects of the noises at their work-place—hearing loss—until they had been exposed to the conditions for many years. There was no traumatic event which gave rise to their injuries; rather, they allege that long-term exposure to hazardous conditions caused their injuries. However, this case differs from the latent injury cases in that the allegedly tortious conduct is continuing, and the plaintiffs continued to be subjected to it after learning of their injuries and the causal connection to the defendant's conduct. The fourth category of cases is also similar to the traumatic event/latent injury case, in that the cause of injury and some of its consequences have become manifest. Though the ultimate gravity of the harm may not be manifest, the plaintiffs have recognized both the injury and its cause. *Hicks* does not address the situation presented by the fourth category of cases, and there seems to be no Sixth Circuit law relating to the application of the statute of limitations where, as here, the plaintiffs have continued to be exposed to the hazardous condition for some time after realizing that it is injurious.

There are several possible rules which could be applied in the fourth class of cases. One option is to apply the discovery rule as in latent injury cases. Under this rule, the plaintiffs would be barred from ever bringing suit for hearing loss as a result of the defendant's conduct if they failed to bring suit within three years of when they discovered their injury and its cause, regardless of whether they continued to work for the defendant and suffer hearing loss. The majority of cases from other circuits support this rule. *See Bealer v. Missouri Pac. R.R. Co.,* 951 F.2d 38 (5th Cir.1991) (applying discovery rule in hearing loss case where plaintiff continued to work for the railroad for approximately six years after discovering his injury and its relationship to the railroad); *Fries v. Chicago & Northwestern Transp. Co.,* 909 F.2d 1092, 1095–96 (7th Cir.1990) (rejecting the appellant's contention that the discovery rule should not apply in his case

---

**2.** Some circuits have applied a different rule in this type of case—the continuing tort doctrine. Under this approach, the statute of limitations is held to accrue only when the plaintiff's exposure to the harmful condition ceases, regardless of when the plaintiff discovered that the injury and its cause. *See Fowkes v. Pennsylvania R.R. Co.,* 264 F.2d 397 (3d Cir.1959).

because his hearing loss continued to worsen beyond the discovery date); *Albert v. Maine Cent. R.R. Co.*, 905 F.2d 541 (1st Cir.1990) (applying discovery rule in hearing loss case and holding that courts should apply the discovery rule when the plaintiff is "unaware when the injury actually occurs"); and *Moore v. CSX Transp., Inc.*, 959 F.2d 231 (Table); 1992 WL 67802 (4th Cir. April 7, 1992) and *Johnson v. Norfolk & Western Ry. Co.*, 985 F.2d 553 (Table); 1993 WL 17061 (4th Cir. January 28, 1993) (both applying discovery rule in hearing loss cases).

A second approach combines the discovery rule with the continuing tort doctrine and limits the plaintiff's recovery to damages incurred in the three years prior to filing suit. This approach could be called the "modified continuing tort theory." The Eleventh Circuit followed this approach in a Jones Act case involving hearing loss. *Santiago v. Lykes Bros. S.S. Co., Inc.*, 986 F.2d 423 (11th Cir.1993) ("Under the continuing tort theory, a plaintiff can only recover damages for any increase in injury which occurred within the statutory period of limitations which in this case is three years prior to filing suit." *Id.* at 428).[3]

A third approach holds that the cause of action does not accrue until the allegedly tortious behavior ceases. The Court of Appeals for the District of Columbia Circuit so held in *Page v. United States*, 729 F.2d 818 (D.C.Cir.1984).

> It is well-settled that '[w]hen a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases.' Since usually *no single* incident in a continuous chain of tortious activity can 'fairly or realistically be identified as the cause of significant harm,' it seems proper to regard the cumulative effect of the conduct as actionable. Moreover, since 'one should not be allowed to acquire a right to continue the tortious conduct,' it follows logically that statutes of limitation should not run prior to its cessation.

*Id.* at 822. *Page* is a medical malpractice case brought against the United States under the Tort Claims Act. *Fowkes v. Pennsylvania R.R. Co.*, 264 F.2d 397 (3d Cir.1959) also follows this rule. In *Fowkes*, the plaintiff's duties as a boiler maker included use of a large air hammer. On occasion, the air hammer would suddenly stop and cause a severe jolt. This jolting caused the plaintiff's shoulders to be affected, and he eventually developed an arthritic condition. The court noted that the plaintiff experienced difficulty with his shoulders beginning in approximately September 1950. On September 9, 1952, he successfully bid for lighter work involving the use of a smaller air hammer. He filed his action on August 31, 1955. The court concluded that the statute of limitations did not begin to run until he was relieved of his jolting work with the heavy hammer in September 1952 and that it was unnecessary to determine the date on which he discovered the connection between use of the air hammer and his injury.

This court adopts the first approach, which applies the discovery rule enunciated in *Urie*. The court finds insufficient justification to depart in "continuing conduct, previously latent, manifest injury cases" from the discovery rule. This court concurs with the Seventh Circuit's reasoning in *Fries v. Chicago & Northwestern Transp. Co.*, 909 F.2d 1092 (7th Cir.1990).

> What the *Urie* Court did not do was provide an escape for plaintiffs who are aware that some type of injury exists yet who choose to ignore it by failing to seek diagnosis and investigate the cause. *[United States v.] Kubrick*, 444 U.S. [111,] 120–121 n. 7 [100 S.Ct. 352, 358, n. 7, 62 L.Ed.2d 259] [ (1979) ]. The tolling permitted by *Urie* only extends the limitations period to the date when the injury manifests itself, not beyond.

*Fries*, 909 F.2d at 1095. "That defendant's [sic—plaintiff's] injury had not reached its maximum severity in 1981 but continued to progress does not affect this result." *Id.* at

---

**3.** For reasons unclear to this court, the *Santiago* court found it relevant that the state courts of

Alabama recognize the continuing tort doctrine.

1096 (citing *Lancaster v. Norfolk & Western Ry. Co.,* 773 F.2d 807, 820–21 (7th Cir.1985)).

The court recognizes that under the discovery rule, a plaintiff's claim could accrue when his hearing loss was minimal, and the statute could expire before the plaintiff adjudged his hearing loss sufficiently severe to warrant bringing suit. In this respect, though, the plaintiffs' situation is no different from a plaintiff in a traumatic event/latent manifestation case, for in such a case, the action accrues at the time of the traumatic event, even though the injuries discernable at the time are only marginally greater than *de minimis,* and even though more severe injuries do not manifest themselves until the statute has run. *Hicks v. Hines, Inc.,* 826 F.2d 1543, 1544 (6th Cir.1987).

The court is also unpersuaded by the *Page* court's rationale that " 'one should not be allowed to acquire a right to continue the tortious conduct.' " *Page,* 729 F.2d at 822 (quoting *Fletcher v. Union Pac. R.R.,* 621 F.2d 902, 907–08 (8th Cir.1980), *cert. denied,* 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981)). Once a plaintiff has discovered that he is being injured by the defendant's conduct, his decision to continue to expose himself to that conduct is an informed choice on his part and presumably reflects the plaintiff's estimation of the risks and benefits involved.

## B. Application of the Rule

### 1. No genuine issue of material fact

■ The defendant has shown, beyond a genuine issue of material fact, that both plaintiffs discovered or reasonably should have discovered their alleged injury and the cause thereof more than three years before the plaintiffs' complaints were filed. Plaintiffs' complaints were both filed on May 24, 1994. Accordingly, the three-year statute of limitations would bar their claims if they discovered the cause and fact of their injuries before May 24, 1991.

In his May 24, 1990 questionnaire, Plaintiff Whitman indicated that he had difficulty in hearing and that he first noticed this difficulty in about 1986. His questionnaire revealed that he had difficulty in understanding spoken words in a noisy environment, a feeling that familiar sounds are muffled, and a need to be near or look at a person speaking to help understand the words. He further indicated that he believed his hearing difficulty was caused by "constant humming noise, air blowing, horn and bell sounding in ears when on engs [sic], wheels squealing on box cars when working on ground." (Exhibit A to Defendant's Brief, p. 4). Whitman responded affirmatively to the question, "Do you believe that your difficulty in hearing has any connection with your employment by a railroad?" (*Id.,* p. 5). He said that he had never worked in any non-railroad job which was noisy.

Plaintiff Hobson, in his January 21, 1990 questionnaire, also indicated that he had difficulty in hearing. He indicated that he first noticed the difficulty in 1987 and that he suffered from pain in the ears, ringing in the ears, a feeling of pressure in the ears, difficulty in understanding spoken words in a noisy environment, a feeling that familiar sounds are muffled, and a need to be near or look at a person speaking to help understand the words. Like Whitman, Hobson stated that he believed his difficulty in hearing was connected with his employment by a railroad. He wrote, "I could hear normal conversation before I came to the railroad." (Exhibit C to Plaintiffs' Brief, p. 4).

There can be no dispute that both plaintiffs knew—or at least suspected—well before May 24, 1991 that they had hearing loss caused by noises at work. Plaintiff Hobson knew in January 1990, if not before, and Plaintiff Whitman knew in May 1990, if not before.

Both Plaintiffs have subsequently denied that the answers they provided in the questionnaires were truthful. However, contradictory statements by the non-moving party do not create a genuine issue of material fact. "It is 'accepted precedent' that after a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1352 (6th Cir.1991). The same is true here, where the

previous statement was made in a signed document acknowledged to be authentic. Each plaintiff signed the statement, "I have read each of the questions and responses in this questionnaire. I affirm that the responses are true, accurate and complete." While the plaintiffs now deny the veracity of the statements made in the questionnaires, they offer no explanation. In the absence of evidence that the questionnaires were filled out as a joke or under duress or some incapacity, the court will not take a later repudiation of the statements made therein as sufficient to create a genuine issue of material fact.

### 2. No requirement for medical diagnosis for claim to accrue

Plaintiffs argue that they should not be held to have known or have had any reason to know of their injury and its cause until they were informed by a health professional that they had hearing loss due to noise exposure; this occurred on May 13, 1993. This is incorrect. Claims for hearing loss may accrue within the meaning of 45 U.S.C. § 56 before they are formally diagnosed by a physician or other health care provider. The plaintiffs in *Albert v. Maine Central R.R. Co.,* 905 F.2d 541 (1st Cir.1990) raised the same argument in a hearing loss case under FELA, but the First Circuit rejected their argument.

> [Plaintiffs] claim that an injured party is ignorant on medical causation issues until he has received a medical diagnosis that his injury is work related. Thus, they reason, since the record contains no evidence that a medical professional diagnosed occupationally induced hearing loss more than three years before suit was started, the statute of limitations had not run. We disagree, finding the district court's analysis, which imparts a requirement of diligence, more appropriate.

> .    .    .    .    .

> Once each [plaintiff] reached the conclusion that he believed he had a hearing loss and that he believed that the injury was caused by his employment, we find that he had a duty to investigate the situation in order to confirm or deny his belief. This

is especially true here where the [plaintiffs] thought they knew the cause of their injury. To hold otherwise would essentially render the FELA statute of limitations meaningless.

*Id.* at 544. "[I]t is not necessary that the plaintiff be formally advised by a physician or receive a medical diagnosis as to the cause of injury for the action to accrue." *Williams v. Southern Pac. Transp. Co.,* 813 F.Supp. 1227, 1232 (S.D.Miss.1992). *Accord, Townley v. Norfolk & Western Ry. Co.,* 887 F.2d 498 (4th Cir.1989). One may know or reasonably be expected to know that he has suffered work-related hearing loss prior to medical confirmation of that fact; indeed, hearing tests are generally administered to individuals who have some reason to think that they have suffered hearing loss. Furthermore, certainty on the plaintiff's part as to causation is not required in order for the claim to accrue. "[T]he injured plaintiff need not be certain which cause, if many are possible, is the governing cause but only need know or have reason to know of a potential cause." *Fries v. Chicago & Northwestern Transp. Co.,* 909 F.2d 1092, 1095 (7th Cir.1990). Plaintiffs have "an affirmative duty to investigate the potential cause of [their] injury." *Id.*

### 3. Estoppel

■ Plaintiffs argue that the defendant should be estopped from asserting the statute of limitations as a defense because the defendant told both plaintiffs that their "hearing in both ears is satisfactory for hearing and understanding conversation." In *Glus v. Brooklyn Eastern Dist. Terminal,* 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959), the United States Supreme Court held that a defendant may, in some circumstances, be estopped from invoking the statute of limitations.

> We have been shown nothing in the language or history of the Federal Employers' Liability Act to indicate that this principle of law, older than the country itself, was not to apply in suits arising under that statute. Nor has counsel made any convincing arguments which might lead us to

make an exception to the doctrine of estoppel in this case.

*Id.* at 233, 79 S.Ct. at 762–63.

The principle is that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage.

*Id.* at 234, 79 S.Ct. at 762. In *Glus*, the defendant allegedly represented to the plaintiff that he could begin his action at any time within seven years after it had accrued. The Court did not decide that the defendant was estopped from invoking the statute of limitations, but left that decision to the trial court.

In *Louisville & Nashville R.R. Co. v. Disspain*, 275 F.2d 25 (6th Cir.1960), the United States Court of Appeals for the Sixth Circuit held that the statute of limitations was tolled because of misrepresentation where a railroad doctor told the plaintiff that there was nothing wrong with his back and he should return to work. In fact, x-rays taken by the doctor indicated that the employee had a disc involvement. In *Disspain*, the accident happened on July 19, 1951, the doctor made his statement on April 25, 1952, and the suit was commenced on November 11, 1957. Plaintiff relied on this doctor's statement and returned to work and did not bring his action within the statutory period because he believed that there was nothing the matter with him; he did not learn of the truth until November 10, 1954, when another physician informed him that he had a disintegrated intervertebral disc which required surgery.

Plaintiffs' case differs significantly from *Disspain*. The most important difference is the difference in the timing of the allegedly misleading statement. The hearing test reports which reported that both plaintiffs' hearing was "satisfactory for hearing and understanding conversation" were received by the plaintiffs sometime after August 7, 1991 in the case of Plaintiff Whitman and July 2, 1991 in the case of Plaintiff Hobson. Plaintiffs' questionnaires reported that they realized they had hearing loss in 1986 in Whitman's case and 1987 in Hobson's. While the questionnaires do not specifically ask when the plaintiffs realized that their hearing loss was related to their employment, there is no evidence that either recognized any cause other than their employment. Furthermore, the court finds, as a matter of law, that an objectively reasonable person in the plaintiffs' position would have realized that his hearing loss was related to his employment by the defendant railroad. Thus, in both cases, the statute had already run in 1991, when the company-sponsored hearing test results were reported.

The court also notes that a report that the plaintiffs' hearing is "satisfactory" is not inconsistent with a loss of hearing and a possible claim under the FELA. In fact, Hobson's report, while stating that his hearing is "satisfactory for hearing and understanding conversation" also reports that he has "some hearing loss for the high-pitched tones for which you were tested." The term "satisfactory" is not defined on the report form, and there is no reason to surmise that it means "no hearing loss." A level of hearing which is "satisfactory" for purposes of working on a railroad may not be "satisfactory" to an individual for his personal purposes. Thus, the statements in the hearing report could not have induced reasonable reliance by the plaintiffs in failing to file suit, in light of their own personal knowledge of the state of their hearing.

**4. Propriety of questionnaire**

Finally, Plaintiffs argue that the defendant acted improperly because it "attempted to insulate itself against a legitimate hearing loss claim" by leading the plaintiffs to acknowledge their hearing loss, in order to begin the running of the statutory period, and then administering a hearing test and notifying them that their hearing was "satisfactory," thus leading them to believe that they had suffered no injury. (Plaintiffs' Brief, p. 18). The court is unpersuaded by this argument.

First, the court notes that the defendant had no duty to advise the plaintiffs of their right to sue or to advise them on how best to preserve or proceed on their claims. Were

this a criminal case, the government would, of course, be required to advise the opposing parties of their constitutional rights to remain silent and to obtain the assistance of counsel; the government is also required to provide opposing parties with potentially exculpatory evidence. Defendants in civil cases, under our system, are not under the same legal obligation. Rather, our adversary system of justice—like a free market economy—is based on the principle that opposing parties, each pursuing their own self interest, will reach the optimal result. "[T]he adversary system contemplates that the Truth will best emerge from the combat of the lawyers." *Hartmann v. Prudential Ins. Co. of America*, 9 F.3d 1207, 1215 (7th Cir.1993) (Cudahy, J., concurring in part and dissenting in part).

Second, the court sees nothing improper about the defendant's decision to circulate the questionnaire. The questions seem to have been designed simply to elicit truthful responses from the defendant's employees with respect to possible claims for hearing loss. The questionnaires also served the interests of potential plaintiffs in two ways: They may have alerted some of the respondents to the existence of a potential claim and the possibility of filing suit, and they served to record the respondents' view of their condition at the time they filled out the questionnaires. Though the plaintiffs' answers, coupled with their inactivity during the intervening years, might now be interpreted as having "insulate[d] the defendant from liability," such an interpretation in retrospect does not show the court any evidence of a dark motive by the defendant at the time the questionnaires were circulated.

Finally, the court notes that each plaintiff filled out the questionnaire and affirmed that his responses were true, accurate, and complete. Both plaintiffs now deny that their answers in the questionnaires were truthful. Obviously, the plaintiffs either were untruthful when they filled out the questionnaires, or they are being untruthful now. The plaintiffs' attempts to invoke equity in their favor are misguided, as it seems to the court that the equities lie with the defendant.

In sum, the defendant has shown that there is no genuine issue of material fact that the plaintiffs discovered their hearing loss and its alleged connection to the defendant before May 24, 1991. Because the plaintiffs knew or reasonably should have known of their injury and its connection to the defendant more than three years before they filed suit, their claims are barred by the statute of limitations in the Federal Employers Liability Act.

## V. Conclusion

The defendant is entitled to summary judgment because the plaintiffs' claims are barred by the statute of limitations, 45 U.S.C. § 56.

IT IS SO ORDERED.